Page 1

```
1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 13-12094-reg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6    TUCCI EQUIPMENT RENTAL CORP.,

7                         Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

9    Case No. 13-12180-reg

10   In the Matter of:

11   ANTHONY R. MARTUCCI,

12                         Debtor.

13   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

14

15                   United States Bankruptcy Court

16                   One Bowling Green

17                   New York, New York

18

19                   September 12, 2013

20                   10:14 a.m.

21

22   B E F O R E :

23   HON ROBERT E. GERBER

24   U.S. BANKRUPTCY JUDGE

25
```

1    Doc. #2 Case Conference

2

3    Doc. #22 Case Conference

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sherri L. Breach, CERT*D-397

                                                              Page 3

1    A P P E A R A N C E S :

2    LAW OFFICE OF ROBERT S. LEWIS, P.C.

3         Attorneys for Anthony Martucci, Debtor

4         53 Burd Street

5         Nyack, New York 10960

6

7    BY:  NICOLE L. PERSKIE, ESQ.

8

9    TORRE, LENTZ, GAMELL, GARY & RITTMASTER, LLP

10        Attorneys for First National Ins. Co. of America, a

11        member of the Liberty Insurance Group

12        2 Penn Plaza, Suite 1500

13        New York, New York 10121

14

15   BY:  ROBERT BEAU LEONARD, ESQ.

16

17   LAZER, APTHEKER, ROSELLA & YEDID, P.C.

18        Attorneys for Capital One, N.A.

19        225 Old Country Road

20        Melville, New York 11747

21

22   BY:  JENNIFER L. SILVESTRO, ESQ.

23

24

25

Page 4

1

2   NEW YORK CITY LAW DEPARTMENT

3        Attorneys for City of New York

4        100 Church Street

5        New York, New York 10007

6

7   BY:  ZACHARY B. KASS, ESQ.

8

9   UNITED STATES DEPARTMENT OF JUSTICE

10   OFFICE OF THE UNITED STATES TRUSTEE

11        Attorney for U.S. Trustee

12        33 Whitehall Street, 21st Floor

13        New York, New York 10004

14

15   BY:  MICHAEL DRISCOLL, ESQ.

16

17   SANKEL, SKURMAN & MCCARTIN, LLP

18        Attorneys for Valley National Bank

19        477 Madison Avenue

20        New York, New York 10022

21

22   BY:  CLAUDIO DESSBERG, ESQ.

23

24

25

Page 5

1

2  TIBBETTS, KEATING & BUTLER, LLC

3        Attorneys for Michelle Martucci

4        43 Corbin Drive

5        Darien, Connecticut 06820

6

7  BY:  M. DAVID COMETTI, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2          THE COURT:  Tucci Equipment rental.

3       (Pause)

4          THE COURT:  Okay.  I remember some of you by face,

5   but I have to apologize that I don't remember names.  I need

6   appearances.

7          MS. PERSKIE:  Nicole Perskie from the Law Office

8   of Robert Lewis on behalf of the debtor, Anthony Martucci,

9   who is to my left.

10          THE COURT:  Okay.  And that was Perskie?

11          MS. PERSKIE:  Correct.

12          THE COURT:  Thank you.

13          MS. SILVESTRO:  Jennifer Silvestro from Lazer,

14   Aptheker, Rosella & Yedid, P.C. for Capital One, secured

15   creditor.

16          MR. DRISCOLL:  Good morning, Your Honor.  Mike

17   Driscoll for the U.S. Trustee.

18          THE COURT:  Thank you, Mr. Driscoll.

19          MR. KASS:  Zachery Kass from the New York City Law

20   Department on behalf of the City of New York.

21          THE COURT:  Thank you, Mr. Kass.

22          MR. LEONARD:  Robert Leonard, Torre, Lentz,

23   Gamell, Gary & Rittmaster, LLP, attorneys for the surety

24   which is First National Insurance Company of America, a

25   member of the Liberty Insurance Group.

1              THE COURT:  Okay.  Thank you, Mr. Leonard.

2              MR. COMETTI:  Mario Cometti from Tibbetts Keating

3     & Butler on behalf of Michelle Martucci, the former spouse

4     of the debtor.

5              THE COURT:  Did you say Cometti?

6              MR. COMETTI:  That's correct, Your Honor, Cometti.

7              THE COURT:  Thank you.

8              Okay.  Everybody have seats except Ms. Perskie.  I

9     would like to --

10             MR. LEONARD:  Excuse me, Your Honor, if I may just

11    introduce -- my client is here, also, Michael Bramhall (ph)

12    from Liberty.

13             THE COURT:  Okay.  Thank you.  And that was Mr.

14    Leonard, right?

15             MR. LEONARD:  Yes, Your Honor.

16             THE COURT:  Okay.  Thank you.

17             MS. PERSKIE:  Your Honor --

18             THE COURT:  Yes.  Come to the main mic if you

19    would, please, Ms. Perskie.

20             MS. PERSKIE:  I just wanted to mention first this

21    is the Tucci Equipment Rental matter.  I don't know if

22    you're planning to appear on the personal matter, which is

23    next on the calendar.

24             MR. COMETTI:  Yes.

25             MS. PERSKIE:  Okay.  I just wanted to clarify

Page 8

1    that.

2             Today is the second status conference we're having

3    on behalf of Tucci Equipment Rental Corporation and we have

4    finally received funds.  The debtor received a check for

5    $59,000 for payment on a job that was performed prior to

6    bankruptcy.  That is currently being held in his DIP

7    account.

8             We're having some issue -- somewhat of an issue

9    coming up with the budget.  The 59,000 that came in, we have

10   past due wages in the amount of $39,252.  That would be --

11            THE COURT:  Which is to workers on various jobs on

12   behalf of your client?

13            MS. PERSKIE:  Correct, which were performed with

14   -- within 180 days of the bankruptcy filing and that would

15   be compensating Mr. Martucci 10,000 out of the approximately

16   18,000 he's owed.  If we were to pay the past due wages,

17   insurance is $12,000.  We've pretty much spent all of the

18   money the debtor has at that point.

19            THE COURT:  Now is that a liability insurance,

20   casualty insurance, what kind?

21            MR. MARTUCCI:  Liability -- general liability.

22            MS. PERSKIE:  We've been in discussions --

23            THE COURT:  Pause, please.  How much of the wages

24   due are to your rank and file as contrasted to your client's

25   principal?

Page 9

1            MS. PERSKIE:  Ten-thousand is to the client's

2    principal.  The other 29,252 are to various other employees.

3            THE COURT:  So that's about 29,000 to what I

4    called rank and file?

5            MS. PERSKIE:  Correct.

6            THE COURT:  Uh-huh.  Keep going.

7            MS. PERSKIE:  The issue we've had with this matter

8    is I had posted an operating report, which was a to date

9    operating report just to kind of update everybody on where

10   we're at.  My client's owed approximately $1.2 million by

11   the city for various work that's been performed.  All but

12   two jobs have been billed for already.  But we have not

13   received funds on the other jobs.  And determining the

14   status of this money has been next to impossible.  I don't

15   know if there's a way for Your Honor to order something

16   where I could serve it upon, you know, the various parties:

17   The housing preserve, HPD, New York City of Parks, the City

18   of Yonkers.  We're running --

19           THE COURT:  Have you talked to Mr. Kass about

20   trying to get that information without me ordering it?

21           MS. PERSKIE:  I have not, Your Honor.

22           THE COURT:  Well --

23           MS. PERSKIE:  I will discuss it --

24           THE COURT:  -- he's the lawyer for the city.  I

25   would assume those agencies are under his wing or he would

Page 10

1   know who to talk to.  I'll -- I'll give you a chance to

2   response, Mr. Kass, but that's --

3           MR. KASS:  We -- we do represent those agencies.

4           THE COURT:  Okay.  That's a question that occurs

5   to a judge, Ms. Perskie.  You know, how -- how -- whether

6   you might be able to advance this case by getting on the

7   phone with these people.

8           MS. PERSKIE:  Correct.  I've -- I've made several

9   phone calls.  I have not spoken with Mr. Kass.  I know Your

10  Honor had put aside time for us to talk today and I was

11  hoping that we could maybe get -- get status on some of the

12  payments that I had --

13          THE COURT:  Okay.  Let -- let me just tell you

14  something that I told a lawyer in another case yesterday

15  where a lawyer was kind of in your shoes and was trying to

16  deal with the IRS, and maybe there's no bureaucracy worse in

17  the country than the IRS, but maybe the city agencies come

18  into second place.

19          My experience has taught me that when you talk to

20  the lawyers for these folks, the U.S. Attorney's Office, the

21  Corporation Counsel's office, the A.G.'s office, you get

22  much more thoughtful and quick responses than you deal with

23  the bureaucratic agencies themselves.  I asked, and either

24  because of the bully pulpit (sic) or because he didn't want

25  to annoy me or because it's the natural tendency of lawyers

1    to ask responsibly, when I said, can you deal with the U.S.

2    Attorney's Office instead of the IRS, the A.U.S.A., the

3    assistant U.S. attorney who showed up that day said, of

4    course.

5          Mr. Kass -- I haven't put Mr. Kass on the spot

6    yet, but I will in a moment, and I would ask that you

7    communicate with him to try to resolve as much as you guys

8    can consensually without making me order things.  And that's

9    with a full reservation of rights if you later agree to

10   disagree or if he can't help you.

11         It's at least possible that your client's survival

12   will depend on collecting receivables, some of which may or

13   certainly will be disputed and some of which may or may not

14   be undisputed.  But your tasks, it would seem to me, is to

15   try to move your cases as quickly as you can with as little

16   in the way of administrative expenses as you can, and it

17   seems to me -- I -- that the best way to do that is to pick

18   up the phone or to chat with people in person.

19         MS. PERSKIE:  Your Honor, I have to be perfectly

20   honest.  When we chatted last time I was very discouraged by

21   the City's response to a debtor being in bankruptcy.

22         THE COURT:  Well, then, if you've tried and failed

23   what I've suggested, then you've tried and failed.  If

24   you've got to, you can make a motion for a 2004 exam which

25   -- to which there are very few defenses.  Then you're into

```
 1    motion practice.  You're into document production.  You're

 2    into depositions, all of which I'll give you.  In my smaller

 3    cases I've found -- again, with the benefit of experience --

 4    that debtors don't often have the time or resources to

 5    engage in that, but that's your call.

 6              MS. PERSKIE:  Thank you, Your Honor.

 7              Do you have any further thoughts you want to share

 8    with me before I allow the other parties to be heard?

 9              MS. PERSKIE:  I do not have any further thoughts

10    to share at the moment.

11              Thank you.

12              THE COURT:  All right.  Who wants to be heard

13    next?

14              Ms. Silvestro, you're the highest in the capital

15    structure.  Do you want to be heard?

16              MS. SILVESTRO:  Thank you, Your Honor.  I did

17    speak with Ms. Perskie over the last two days regarding the

18    receipt of the check and the budget, and I have suggested to

19    her a few different ways to possibly make some proposal to

20    my client as far as because there's not truly a monthly

21    income since the debtor isn't operating, but coming up with

22    some other different structure as far as as money comes in,

23    maybe a percentage or certain amounts would be paid in

24    different orders.

25              As soon as I get that, I'll certainly pass it onto
```

1   my client, but I don't know how long my client's going to be

2   patient.

3            THE COURT:  Yeah.  I understand your client to be

4   secured, but I've forgotten, is this on equipment that's

5   used in the business?  Is this like --

6            MS. SILVESTRO:  It's a --

7            THE COURT:  -- personal property liens?

8            MS. SILVESTRO:  Blanket personal property accounts

9   receivable with a total of about a million-four --

10           THE COURT:  You got a lien on everything --

11           MS. SILVESTRO:  A lien on --

12           THE COURT:  -- effectively?

13           MS. SILVESTRO:  Yes.

14           THE COURT:  Okay.  Thanks.  I appreciate your

15   patience.

16           MS. SILVESTRO:  Thank you.

17           THE COURT:  Who wants to be heard next?  Anybody?

18   Mr. Kass, I need you to come up.

19           MR. KASS:  Sure.

20           THE COURT:  Help me as much as you can, please.

21           MR. KASS:  Yes, Your Honor.  The City is happy to

22   cooperate.  I'm a little surprised at counsel's

23   disappointment since we haven't heard from them since the

24   last status conference.  I don't know where her

25   discouragement arose.  I'll be happy to talk with her after

1    this and -- and see if we can work something out.

2            The City is interested in having the jobs have not

3    been completed to be completed.  The surety is here.  There

4    have been some conversations, I understand, between my

5    litigation colleagues prior to the bankruptcy about that

6    possibility.  We would be happy if the debtor were to work

7    with us cooperatively to see if we can work something out so

8    that the surety would be in a position to go forward and be

9    protected and be paid appropriately.

10           As far as what the debtor claims to be owed, the

11   debtor commenced litigation pre-petition.  Obviously, we're

12   -- we responded in that forum.  This is the debtor's

13   litigation.  Whether it's subject to the automatic stay is,

14   you know, not before the Court at this time.

15           So on the other hand, as -- as I said, we're happy

16   to attempt to cooperate, whether it's in terms of trying to

17   figure out the situation, figure out what agencies had been

18   billed for whatever the debtor claims, what counsel claims

19   the City might have, and in terms of whether there's been

20   some red tape that the debtor hasn't counted that we can

21   help address.

22           THE COURT:  Mr. Kass, I want to put you on the

23   spot the same way I put the U.S. Attorney on the spot

24   yesterday.

25           If I heard you right a moment ago, you said you're

Page 15

1    willing to help cut through red tape and the message you're

2    trying to tell me, whether or not Ms. Perskie would wholly

3    agree with it or not is not yet clear, is you're trying to

4    be a voice of reason in this process.

5           Can I enlist you to be the point person for the

6    city agencies on exchanges of information and see if

7    constructive progress on narrowing or eliminating

8    disagreements can be achieved?

9           MR. KASS:  Certainly, Your Honor.  I would be

10   happy to.

11          THE COURT:  All right.  Thank you.

12          Mr. Leonard, if you were here before I don't

13   remember it.  I would like to get the surety's position.

14          Also, help me with the understanding of any bond

15   or bonds you might issue -- or have issued.  Are we talking

16   about completion bonds or something different?

17          MR. LEONARD:  Robert Leonard, Your Honor.

18          Yes.  We're talking about two performance and

19   payment bond projects which are the Washington Square Park

20   Project and the Bronx Boulevard project.  That's out of 15

21   that were listed on the monthly operating report that was

22   filed yesterday by the debtor.  Those two projects -- of

23   those two projects, the Bronx Boulevard project is

24   apparently not just substantially completed, but as close to

25   final completion as -- as we can imagine, I believe.

1          Washington Square Park is a bit -- has a little

2    more left to be done, but as I understand it, it is not work

3    to be done by Tucci's own forces as opposed to by

4    subcontractors.  As a matter of fact, I have been cautioned

5    that certain of the work has to be done by a licensed

6    nursery contractor which has to be a --

7          THE COURT:  Wait.  A nurse -- you mean nursery

8    like shrubs?

9          MR. LEONARD:  Shrubs, yes.  It's --

10          THE COURT:  You need a license to --

11          MR. LEONARD:  -- Washington Square Park --

12          THE COURT:  -- grow shrubs?

13          MR. LEONARD:  Apparently so.  Yes, Your Honor.  In

14    fact, I think that was one of the disputes on the project at

15    one time.

16          THE COURT:  Go on, please.

17          MR. LEONARD:  So, actually, Liberty has been

18    funding these two projects and -- and especially the

19    Washington Square project for almost three years now, and on

20    Washington Square Park Liberty is net out of pocket at this

21    point for Article 3-A Trust Fund items is approximately

22    $550,000.  The account receivables are -- I'm not quite sure

23    when it says amount here in the operating report exactly

24    what it is, but the number is about $300,000.  So that's not

25    going to reimburse the Article 3-A priority items for which

1    Liberty of course is claiming a priority over the bank.

2            In addition, there's a $220,000 lawsuit by Kelco

3    (ph) against Tucci and Liberty which I did not see mentioned

4    in the list of litigation.  It wasn't in the operating

5    report, but there was a list on a motion that was to be

6    submitted for, I think, joint administration today.

7            In any event, that action is pending in the

8    Supreme Court of New York County.  It is, of course, stayed

9    as against Kelco.  But -- I'm sorry -- as against the

10   debtor.

11           I had spoken with Flora Edwards (ph), the attorney

12   in that action representing Tucci, the debtor.  She has not

13   been retained yet to continue to represent Tucci in relation

14   to that particular lawsuit.  The debtor has asserted, I

15   think, about a $300,000 counterclaim against Kelco in that

16   action, apparently because the city rejected --

17           THE COURT:  Excuse me.  Is Kelco the owner on the

18   job?

19           MR. KASS:  No. I'm sorry.  Kelco was a

20   subcontractor --

21           THE COURT:  Oh, Kelco's a sub.

22           MR. KASS:  -- which has a payment bond claim

23   lawsuit against --

24           THE COURT:  Against your client?

25           MR. KASS:   -- against Liberty and the debtor in

Page 18

1    the State Court for --

2             THE COURT:  Okay.

3             MR. KASS:  -- $220,000.

4             THE COURT:  Do I infer from that correctly that

5    your client has paid some of the subs, but has not paid

6    others, and the others who have not been paid by your client

7    are going after you?

8             MR. KASS:  As far as I know just the one, Kelco.

9    We've paid everybody else as far as I'm aware.

10            THE COURT:  I see.  Okay.  I'm -- I'm catching up

11   to you now.  And am I right in reading that your desire is

12   that the debtor be able to collect any receivables on the

13   underlying jobs, but also for anything you shelled out to

14   subs you're subrogated to their rights and you have rights

15   against the debtor

16            MR. KASS:  Certainly.

17            THE COURT:  Yeah.  I hear you.

18            If you were I, how would you cut through this knot

19   and move this case forward?

20            MR. KASS:  Well, there's one other item that I

21   wanted to mention which is that -- and you were speaking

22   before about technicalities and so forth and red tape.  The

23   debtor is still the contractor of record with the city on

24   both of these projects.  They have not been terminated for

25   default or otherwise.  The debtor will need to decide

1   whether to assume or reject the contracts, depending on a

2   variety of factors.

3          And we are believing that probably the best course

4   at this point would be for it to reject the contract so that

5   it will no longer be the contractor of record and we can

6   have our own -- and I think Liberty is -- Liberty had both

7   an outside consulting firm, surety consulting firm working

8   on this, but also now has its own in-house engineering staff

9   working on this.  And for the most part, the work has been

10  done with the exception of a couple of subcontractors' work

11  items.  And I believe that that can be administered just as

12  well by the Liberty staff and/or their outside surety

13  consultants as by the debtor at this point.

14         Obviously, we would like to work with the debtor

15  for all of the records and knowledge that they have in

16  relation to the project.  And to the extent that they want

17  to pursue all these extra claims against the city, that

18  would be good.  I mean, the more money that can be recovered

19  to repay Liberty, the better off we are.  And we're not

20  looking to make a profit, obviously.  We're just looking to

21  get the --

22         THE COURT:  You're trying to cut your losses.

23         MR. KASS:  -- loss back.

24         I'm sorry.  There was one other --

25         THE COURT:  I'm sorry.  I interrupted you.  I

1   apologize.  Continue.  You were -- you were talking about

2   things that you thought were -- would be constructive for

3   the future of this case.

4           MR. KASS:  Yes.  I think the key -- of course, one

5   key is the flow of funds, of course.  But Liberty does not

6   have a shortfall of operating capital, so at least for now

7   we will advance the monies for the work to be done.  The

8   problem is that as was indicated in the operating report

9   that was just filed, the debtor is -- if you look at the

10  very first three questions:  Is the business still

11  operating, no; have you paid all your bills this month, no;

12  have you paid your employees on time, no; have you paid your

13  insurance premiums, no.

14          If you look outside, the weather is terrific.

15  This is the best time of year for there to be workers out

16  there in the park planting trees and bushes, and it's not

17  happening right now.  And so we need to have something move

18  forward immediately.  I gather that the debtor's decision to

19  accept or reject must be approved by the Court, and I assume

20  that needs to be made on some kind of a motion or perhaps by

21  stipulation.

22          THE COURT:  Yes, but your second half was very

23  true.  And if this can be done by stip, with a non-object

24  from the people in this room, unless I have some reason to

25  believe that there's somebody who is not in this room, we

Page 21

1    can do that real quick.  And what we can do even quicker is

2    approve a stip that like unties knots and has reservations

3    of rights for parties on everything else.

4         So you were a step ahead of me.  I didn't realize

5    the desirability of taking advantage of the good weather and

6    trying to get things buttoned up, but that sounds kind of

7    common sense to me.

8         MR. KASS:  Absolutely.  If they miss this -- this

9    next month and a half or so, two months then it has to go

10   over to the spring which is not a good situation.

11        THE COURT:  It's not a good situation in terms of

12   cash flow for anybody and it's not a good situation in terms

13   of taking advantage of when you can put people to work and

14   get stuff done.

15        MR. KASS:  Yeah.  If I may, Your Honor, also, we

16   do have an agreement of indemnity from the debtor, Tucci

17   Equipment, under which the surety would have certain power

18   of attorney rights and so forth.  But we're always a little

19   reluctant to use that in light of the automatic stay and so

20   on and so forth.  But we -- we would like to move this

21   forward in one manner or another.

22        THE COURT:  Could a stip modifying the stay to

23   give you the avoidance of doubt be constructed?

24        MR. KASS:  Quite possibly.

25        THE COURT:  Okay.  And would an expedited motion

1   for relief from the stay if you can't reach a stip be

2   helpful if you can't reach the stip?

3          MR. KASS:  I did have that in mind and I have seen

4   such motions.

5          THE COURT:  Uh-huh.  Ms. Perskie, you've risen.

6   And I want to hear your perspective.  I've got to tell you

7   guys that what I'm thinking is that a conference to see if

8   agreement can be reached on what Mr. Leonard suggested or

9   some subset of that might be in everybody's interest.

10          Can I ask you to step up if Mr. Leonard's done?

11   Be -- before you go farther, are you done for the time

12   being, Mr. Leonard?

13          MR. LEONARD:  Yes, Your Honor.

14          THE COURT:  Thank you.

15          Ms. Perskie, your perspective.

16          MS. PERSKIE:  Your Honor, my client is quite

17   agreeable.  He would be willing to work with Liberty,

18   assuming it wouldn't affect his rights to the lawsuit he has

19   pending against the city regarding Washington Square Park.

20   He has also, I guess, assigned in writing the payment from

21   the Washington Square Park job was assigned --

22          MR. MARTUCCI:  All -- all parks.

23          MS. PERSKIE:  -- were assigned to Liberty Mutual.

24          THE COURT:  All right.  Well, it doesn't sound to

25   me like you want to go to war with Mr. Leonard or anybody

1    else, other than preserving your rights right now and it --

2    and avoiding prejudice to any claims you may have against

3    the city.  Am I --

4            MS. PERSKIE:  Correct.

5            THE COURT:  -- correct?

6            MS. PERSKIE:  Mr. Martucci would also like an

7    opportunity to be heard if the Court's okay with that.

8            THE COURT:  Yeah.  I'll allow that.

9            MS. PERSKIE:  Okay.

10           THE COURT:  Is that Mr. Tucci?

11           MS. PERSKIE:  Martucci.

12           THE COURT:  Martucci.  I'm sorry.  Oh, your client

13   is Martucci, but the company is Tucci.

14           MS. PERSKIE:  Tucci Equipment.  Our client is

15   Tucci Equipment.  We were also going to represent Mr.

16   Martucci in his personal bankruptcy, but some information

17   has come to light that we may not be able to do so without a

18   conflict of interest.

19           THE COURT:  Yeah.  I see that as a potential

20   issue.

21           But I'll -- is there anybody that objects to me

22   letting Mr. Martucci come up to a microphone?

23           Come on up, Mr. Martucci.  I -- I do want you to

24   understand that my focus today, though, is on the corporate

25   debtor, Tucci Equipment Rental.

1           MR. MARTUCCI:  Yes, sir.

2           THE COURT:  Go ahead.  Keep the mic close to you

3     so I can hear you well.

4           MR. MARTUCCI:  Good morning.  Tucci Equipment has

5     been in business for 27 years.  In 2009, I decided to work

6     for New York City, the Parks Department.  I took on two

7     projects for them and it was in Bronx Boulevard and it was

8     in Washington Square Park.

9           When I started those jobs, the payments weren't

10    paid on time.  About a year after that in 2010, I tried --

11    my lawyer, Flora Edwards, tried to contact the city and

12    everybody involved here to try and get everybody together

13    and figure out what to do about getting these parks to pay

14    their payments on time so we wouldn't be in a situation.

15          Time went by, time went by, and now we have

16    Capital One who is owed money.  We have Liberty who is owed

17    money.  I lost my wife and this is where I'm at.  So the

18    problem is when we tried to contact the city, they turn

19    their back on us.  I spent 45 minutes with Mr. Deblasio (ph)

20    in his office.  He accepted a meeting with me.

21          THE COURT:  Who is Deblasio?

22          MR. MARTUCCI:  Bill Deblasio.

23          THE COURT:  The guy who's the mayoral candidate?

24          MR. MARTUCCI:  Yes.  He was --

25          THE COURT:  What -- what does he have to do with

Page 25

1    acting for the --

2          MR. MARTUCCI:  His --

3          THE COURT:  Oh, he's, what, the public advocate

4    now?

5          MR. MARTUCCI:  Yeah.  I went to the public

6    advocate to try and get help.  They got nowhere.  The -- it

7    seems to be that the Washington Square Park is a real high-

8    end -- was a real high-end project and they set a budget for

9    8 million and they won't go over it.  It cost me 12 million

10   to do the project.  So we put claims in with the city.  I

11   have about 7 million in claims and we can't get the claims

12   to come to the table.  It's been a year and a half now for

13   them to -- to get the claims to have a hearing.  We can't

14   even get that to happen.  So if -- if we can get the claims

15   paid, all these people would be paid and I wouldn't be here.

16   I may not get my wife back, but I -- I -- you know, this is

17   where I'm at.

18          So that's why I wanted to speak today --

19          THE COURT:  Okay.

20          MR. MARTUCCI:  -- so I could clarify.  And -- but

21   as far as --

22          THE COURT:  Okay.

23          MR. MARTUCCI:  -- but as far as the jobs, all the

24   jobs are complete, finished.  The only thing that's not

25   finished is a punch list for the plants, okay.  And the comp

1    -- my subcontractor, Kelco, refuses to go back and finish

2    it.  So we have to find a different contractor to do it.

3    And when you find a different contractor, it costs you

4    additional money when the original contractor is supposed to

5    do it for free.  So that's where Liberty steps in and

6    they're going to pay.

7              So I hope I clarified things a little better.

8              THE COURT:  Okay.  Fair enough.  You do

9    understand, Mr. Martucci, that I can't decide any facts

10   today that might be disputed by anybody else.

11             MR. MARTUCCI:  No.

12             THE COURT:  I -- I wanted to let you just speak

13   your -- your peace and your mind.

14             MR. MARTUCCI:  But this is the first -- this is

15   the first time that we've gotten everybody together and I

16   think it's a step further, you know.

17             THE COURT:  Okay.  All right.

18             Has everybody had a chance to be heard on the

19   corporate bankruptcy who wants to be?

20             Okay.  Here's what we're going to do, folks.  I'm

21   satisfied that at least the lawyers in this case are trying

22   to be helpful and are acting in good faith and share the

23   desire that I have to cut through bureaucratic red tape.

24             I have a dim memory that the last time you were

25   here I invited you to use my conference room behind the

Page 27

1    court room to try to move the case forward.  It's possible

2    that I'm confusing this with another case, but I think it's

3    this one.  And I still think that that's a good idea.

4            Mr. Kass, I am grateful for your efforts to be the

5    point person to enable Ms. Perskie and -- and maybe this

6    would also involve Mr. Leonard -- to see whether facts that

7    they need to -- and information they need to move things

8    forward can be accomplished.  And whether you call it

9    professional responsibility or courtesy to me or whatever, I

10   still think it's helpful and I'm thankful for it.

11           Mr. Leonard, it sounded to me like you had some

12   constructive ideas for trying to give your client the

13   ability it needs, and if I were in your shoes I might want

14   to fight with someone who is writing out checks to move

15   things forward to see if you can cut through red tape, too.

16           Any stips you guys enter, barring something

17   unforeseen, are likely to be approved by me.  Any such stips

18   can and -- and should be drafted with reservations of rights

19   on matters that you can't agree.  But it still seems to me

20   that you can move the ball forward in a number of useful

21   areas.

22           Mr. Leonard, it didn't sound to me like you would

23   need to move for relief from the stay because Ms. Perskie

24   might be willing to meet your legitimate needs and concerns

25   without a motion.

1            I would like you guys to sit down and see how, at

2    the very least, we can button up the existing jobs, tee up

3    any matters that would then be right for payment by the

4    underlying owners, whether we can make progress with the

5    city.  I -- I'm not so naïve as to think that Mr. Kass's

6    good will is going to solve all the problems with the city

7    or it's going to make all the issues with the city go away,

8    but I want to at least see what we can accomplish.

9            Anybody have any further thoughts you want to

10   share with me before I move to the individual motion (sic)?

11           Mr. Leonard.

12           MR. LEONARD:  Robert Leonard.

13           I just wanted to mention that with respect to the

14   Kelco litigation, we are considering the possibility and

15   have discussed this with Tucci's counsel, that it might be

16   removed to the Bankruptcy Court.  It's essentially a three-

17   way dispute between -- for now -- among Kelco and Tucci and

18   the city with, of course, the surety footing the bill one

19   way or the other.  If Kelco's work is determined to have

20   been unacceptable to the city, then as far as we're

21   concerned we should not be paying for it.  On the other

22   hand, if it was acceptable to the city, then we believe the

23   city should be paying for it.

24           So either way --

25           THE COURT:  Either way you --

1               MR. LEONARD:  -- we should not be --

2               THE COURT:  -- consider your client to be the

3      monkey in the middle.

4               MR. LEONARD:  Yes, Your Honor.

5               THE COURT:  Okay.

6               MR. LEONARD:  But right now I guess it's all just

7      under discussion.

8               THE COURT:  All right.  Everybody's got

9      reservations of rights on that.  I appreciate the head's up.

10              All right.  Anything else, anybody?

11              Mr. Driscoll, I -- I haven't given you a chance to

12     be heard.  I -- I suspect your view might be the same as

13     mine which is that you want the case to succeed, but that

14     there's a limit to what you can say or do at this point.  Do

15     you want to be heard?

16              MR. DRISCOLL:  Briefly, Your Honor.  Thank you for

17     the opportunity.

18              THE COURT:  Okay.

19              MR. DRISCOLL:  Your Honor, we have reviewed the

20     wage order and we have no objection, but that's pending if

21     -- whether Capital One wants to release that because that --

22     all of that -- the monies that would be paid through its

23     wage motion are fully encumbered by Capital One's secured

24     claims.

25              THE COURT:  So -- so it's not the issue that we

Page 30

1   judges normally deal with on first day motions.  And, of

2   course, this is no longer a first day motion.  You're not

3   standing in the way, but you're saying that ultimately

4   Capital One has to decide what it wants to do.

5           MR. DRISCOLL:  That's -- that's my understanding,

6   Your Honor.

7           THE COURT:  Okay.

8           MR. DRISCOLL:  We have reviewed this motion and it

9   -- and it does comply with the statutory caps for paying all

10  of the employees, including Mr. Martucci.

11          Going forward, there is the issue of conflict of

12  interest between the Tucci case and Mr. Martucci's personal

13  bankruptcy case.  At present, we have -- the U.S. Trustee's

14  Office has not come in and tried to stop the Lewis law firm

15  from representing both entities.  Typically, we take the

16  approach that where there is a potential conflict of

17  interest, just to be sure we would ask that one law firm

18  does not represent both the entity and the individual.

19          However, we are aware of the economy's of this

20  case.  It is a small case.  We do want to exercise our

21  discretion, at the same time as making sure that the Lewis

22  law firm was both disinterested and did not have an adverse

23  interest to either estates.  At present that's why we

24  haven't stepped in and asked the Lewis law firm to perhaps

25  seek a change, either step out of the case entirely or step

Page 31

1    out of one case.

2            At this time we can't make that determination

3    because we don't have enough information.  It was -- it came

4    to our attention at the April 23rd -- excuse me -- August

5    23rd 341 hearing in Mr. Martucci's personal case that there

6    was potential loans that Mr. Martucci made to Tucci Rental.

7    Whether those are just merely capital contributions or

8    indeed notes backed by some sort of documentation we don't

9    know yet.

10           We also don't know whether there are any potential

11   Chapter 5 actions between either -- either estates that

12   would render a actual conflict of interest with Mr. Lewis's

13   law firm and Ms. Perskie.

14           So at this time, Your Honor, we can't make that

15   determination.  So I apologize that we're this far into the

16   case and the U.S. Trustee hasn't stepped in, but we are

17   doing our due diligence and trying to exercise reasonable

18   discretion in not making a big deal out of something that

19   might not necessarily be a big deal.

20           THE COURT:  No.  I think that's exactly the kind

21   of answer that satisfies me.  I was hoping, and you

22   delivered on my hope, that you would take a balancing

23   approach between making sure that conflicts don't gore

24   anybody's ox, if I can use that expression, and protect the

25   system while at the same time using common sense. I'm very

1    satisfied.

2           I assume you're telling me that you're going to

3    continue to monitor it and that if we move from potential

4    conflict to actual conflict you'll let me know and that's

5    fine with me.  So I appreciate that, Mr. Driscoll.

6           Unless there are further thoughts you want to

7    share with me, that's just fine and I -- and let me express

8    my appreciation for your handling it in such a thoughtful

9    way.

10           Thank you.

11           MR. DRISCOLL:  Thank you, Your Honor.

12           THE COURT:  Okay.  All right.  Anybody else want

13    to be heard on the -- at this point?

14           I do want to use whatever bully pulpit or muscle I

15    have to ask you guys to get together in my conference room

16    and see what you can do by agreement in the next hour or so.

17           Okay.  Thank you, folks.

18           (A chorus of thank-you)

19           MS. PERSKIE:  Did you -- did you want to hear his

20    personal bankruptcy --

21           THE COURT:  Oh, forgive me, Ms. Perskie.  Yes, I

22    do.

23           Could I impose -- anybody who is here solely on

24    the corporate matter is free to go into the conference room

25    now, but maybe it's better for everybody who might care

1    about the individual 11 to also step up at this point and

2    for the others to continue to listen.

3            I have no memory of the personal 11 of Mr.

4    Martucci.  Is this the first case conference on it or did I

5    just forget from before?

6            MS. PERSKIE:  Your Honor, this is the first case

7    conference on it.  It was transferred from another judge to

8    Your Honor.  I made a motion yesterday -- or I made an

9    application I should say for joint administration of these

10   two cases.  As you can see, there's many of the same people

11   involved in both matters and I believe it would save

12   resources for --

13           THE COURT:  Okay.

14           MS. PERSKIE:  -- the creditors and the debtor.

15           THE COURT:  Have I signed a joint admin order yet?

16           MS. PERSKIE:  You have not.

17           THE COURT:  Has the time for objections come and

18   gone?

19           MS. PERSKIE:  No.  It was filed yesterday.  I

20   believe it's -- there's still time.

21           THE COURT:  Okay.  Because joint administration

22   orders are merely administrative and enable me to see the

23   big picture and have no substantive effect at all on most

24   significantly emerging assets, I don't think it's likely

25   that there's going to be an opposition.  I'm going to assume

 1    that there's going to be no op, but people's rights on that

 2    are reserved.

 3              MS. PERSKIE:  Thank you, Your Honor.

 4              THE COURT:  Mr. Cometti appeared on behalf of Mr.

 5    Martucci's, is it at this point former wife or just

 6    estranged wife?  What's the procedural context now, Mr.

 7    Cometti?

 8              MR. COMETTI:  Post-divorce (indiscernible).  Ex-

 9    wife.

10              THE COURT:  Okay.  The divorce is -- is fully

11    complete?

12              MR. COMETTI:  Correct.

13              THE COURT:  Okay.  Is anybody else appearing in

14    the individual case who hasn't been heard yet?

15              MR. DESSBERG:  Yes, Your Honor.

16              THE COURT:  Come up, please.

17              MR. DESSBERG:  Good morning, Your Honor.  Claudio

18    Dessberg representing Valley National Bank.

19              THE COURT:  Was that Dessberg, D-E-S --

20              MR. DESSBERG:  D-E-S-S -- D-E-S-S-B-E-R-G.

21              THE COURT:  Okay.  With a G like Gerber at the

22    end.

23              MR. DESSBERG:  That is correct.

24              THE COURT:  Okay.  And you've got Valley what

25    bank?

Page 35

1          MR. DESSBERG:  Valley National Bank.

2          THE COURT:  Okay.  Okay.  And Mr. Leonard?

3          MR. LEONARD:  And Robert Leonard of Torre, Lentz,

4    Gamell, Gary & Rittmaster, LLP, attorneys for First National

5    Insurance Company of America, a member of the Liberty Group.

6    We are here because Mr. Martucci signed an agreement of

7    indemnity as an individual guaranteeing the obligations

8    which may arise in relation to the Tucci Equipment surety

9    bonds.

10         THE COURT:  Okay.  Fair enough.

11         All right.  Ms. Perskie, give me an update on the

12   status of this one.

13         MS. PERSKIE:  As far as the status of this case

14   goes, we were looking to see if we could make Tucci

15   Equipment profitable and have Mr. Martucci be able to

16   collect a regular salary from Tucci Equipment.

17         In regards to Valley National, I believe they have

18   a lien on 336 Beretto (ph) Street which is the current

19   premises that the debtor in this case and the principal of

20   the debtor in the prior case occupies.

21         We've just recently been provided with an offer

22   for lease of that space and, perhaps, Valley National would

23   be interested in signing off on that.  There's some

24   equipment that would need to be moved from that location or

25   auctioned, but we were hoping to come to some kind of

Page 36

1    agreement --

2              THE COURT:  Pause, please, Ms. Perskie.

3         (Pause)

4              THE COURT:  Continue, please.

5              MS. PERSKIE:  We were hoping to come to some type

6    of agreement with Valley National, perhaps a loan

7    modification, to handle that foreclosure.

8              THE COURT:  What communications have you had with

9    Valley National or its counsel?

10             MS. PERSKIE:  This would be -- today would be the

11   first time.  I was just provided with the lease a couple of

12   days ago and there's been a lot of information to sort

13   through.  I've been provided with a lot of the information

14   very recently.

15             THE COURT:  All right.

16             MS. PERSKIE:  They have not entered an appearance

17   on the docket yet either, so I wasn't aware they were going

18   to be appearing today.

19             THE COURT:  Did you know about Mr. Dessberg being

20   available as a resource before today?

21             MS. PERSKIE:  I did not.

22             THE COURT:  All right.  Do other folks want to be

23   heard vis-à-vis the status of Mr. Martucci's personal case?

24             Mr. Dessberg.

25             MR. DESSBERG:  Thank you, Your Honor.

Page 37

1          I just wanted the Court to be aware that there is

2    a pending foreclosure action based on a mortgage loan made

3    to a different entity that's not in bankruptcy called 336

4    Beretto, LLC, also owned by Mr. Martucci.  Mr. Martucci was

5    named as a defendant in that action since he personally

6    guaranteed that loan.

7          We will most probably be asking the Court or

8    possibly debtor's counsel, if we can stipulate to this, for

9    a limited relief from the stay in order to proceed with that

10   case limited to going against the property.  The procedure

11   under New York's real property actions and proceedings law

12   is that in order to preserve any right to a potential

13   deficiency judgment against guarantors or borrowers in the

14   event that the foreclosure sale does not generate enough

15   asset -- proceeds to satisfy the loan, those people have to

16   be named in the action and they also have to be named in the

17   final judgment.

18          That doesn't mean that we will be proceeding

19   against Mr. Martucci personally.  It's an option which

20   arises only in the event that there -- the sale proceeds are

21   not enough to satisfy the debt.

22          THE COURT:  Do you have a sense as to the value of

23   the property relative to the debt secured by the property?

24          MR. DESSBERG:  Somewhat, Your Honor.  The debt is

25   approximately $400,000.  We believe the property is worth

Page 38

1   more than that.  I believe the debtor has listed it as being

2   worth --

3          THE COURT:  We have so --

4          MR. DESSBERG:  -- a million-six.

5          THE COURT:  -- many debtors here, I'm getting

6   confused as to which one we're talking about.

7          MR. DESSBERG:  I'm sorry.  Not the debtor.  33 --

8   Mr. Martucci -- that's a different issue which I also wanted

9   to bring up to the Court.

10         Mr. Martucci's bankruptcy schedules, his personal

11  bankruptcy schedules list a lot of assets that are not

12  personal assets.  They're corporate assets, including at

13  least two out of the three real estate properties.  They're

14  not owned by Mr. Martucci.  Mr. Martucci owns an interest in

15  a corporation which owns those properties.

16         Same with the bank accounts.  All of the bank

17  accounts listed in Mr. Martucci's individual bankruptcy

18  schedules are, in fact, held by various corporate entities

19  in which Mr. Martucci has an interest.  The bank, Valley

20  National Bank and it appears several other creditors are

21  also listed as secured creditors when they're not, certainly

22  not Valley.  We're unsecured in this case with respect to

23  our claim against Mr. Martucci.  He signed a personal

24  guarantee which is unsecured.  And I believe the same

25  applies to some of the other --

1          THE COURT:  Pause, please --

2          MR. DESSBERG:  -- creditors.

3          THE COURT:  -- Mr. Dessberg.  Were the schedules

4    that you were talking about that listed assets not of Mr.

5    Martucci personally but of corporations in which he had an

6    interest, were they prepared by lawyers?

7          MR. DESSBERG:  I believe by Mr. Lewis's firm.

8    Yes.

9          THE COURT:  All right.  Go on, please.

10          MR. DESSBERG:  Now generally speaking, apart from

11    a lot of confusion in the schedules and a lot of

12    inconsistencies, some creditors are listed as both secured

13    and unsecured.  The amounts involved are sometimes

14    incorrect.

15          Apart from all those issues which can probably be

16    resolved, I'm not sure where this individual bankruptcy is

17    going.  Mr. Martucci does not appear to have any assets

18    apart from some small amount of personal property and his

19    interest in his corporate entities.  He lists his income as

20    zero.  He claims he's received no income for the past two

21    years.  He does -- he claims he has monthly expenses of

22    $18,000.  I'm not sure how this case is going to proceed to

23    a reorganization other than Mr. Martucci wanting his

24    companies to become profitable so he can be paid wages.

25          So potentially we -- we see this as going into a

1  Chapter 7 or possibly be dismissed down the road, but that

2  remains to be seen.

3  　　　　　THE COURT:  All right.  Now the matter as to which

4  you're interested in the potential modification of the stay,

5  that is against a corporation as to which Mr. Martucci's a

6  guarantor?

7  　　　　　MR. DESSBERG:  Correct, Your Honor.

8  　　　　　THE COURT:  Uh-huh.  All right.

9  　　　　　And if I heard you right, there's a potential

10  surplus in that property which, if there were a surplus,

11  after your client were paid off then the value of that

12  surplus would flow to the corporate obligor to you --

13  　　　　　MR. DESSBERG:  Correct, Your Honor.

14  　　　　　THE COURT:  -- which would at least, in theory,

15  provide value in the equity in that corporation.  Is Mr.

16  Martucci the equity holder or one of many equity holders?

17  　　　　　MR. DESSBERG:  I believe he's the 100 percent

18  owner of 336 Beretto if I'm not mistaken, which is not in

19  bankruptcy.

20  　　　　　THE COURT:  Now that would have two corollaries:

21  One would be that you wouldn't need to go after him on the

22  personal guarantee or to file a claim in the 11 we have here

23  because you were already paid off.  The second, of course,

24  would be that there might be some value in the stock which

25  would be of use to the other creditors of Mr. Martucci in

1    this 11, or am I missing something?

2            MR. DESSBERG:  Well, if there is a surplus, that

3    would go to 336 Beretto Street, a separate entity which is

4    not in bankruptcy.  I suppose that company could be

5    liquidated by Mr. Martucci and whatever asset -- whatever

6    cash remains in the -- in their coffers would go to Mr.

7    Martucci as the 100 percent owner.

8            So, yes.  Potentially, years from now that could

9    happen; that there would be some surplus monies that make

10   their way to Mr. Martucci individually.

11           THE COURT:  Uh-huh.

12           MR. DESSBERG:  Currently, the -- this is in Bronx

13   County.  The foreclosure process is taking, I would say, an

14   average of two years or more.

15           THE COURT:  And how good are foreclosures in Bronx

16   County in getting top value for the underlying property, or

17   is this something where your client would simply be

18   intending to credit bid and then take the value of the

19   property and just account for the remainder under state law?

20           MR. DESSBERG:  That I cannot predict, Your Honor.

21   It all depends on whether there are other interested bidders

22   at the auction, whether the property has values to potential

23   developers or buyers.  The bank would bid in its mortgage or

24   a portion of its mortgage at the auction, and the most it

25   could bid in was the amount of the debt, which is

1    approximately 400,000.

2              THE COURT:  Uh-huh.  Now is this the same or

3    different property than Ms. Perskie was telling me she

4    wanted to have a dialogue with you about?

5              MR. DESSBERG:  I don't know.

6              MS. PERSKIE:  This is the same property I would

7    like to have a dialogue about.  The loan is relatively

8    small, I mean, 400,000.  I can't imagine the arrears are

9    terrible and I would imagine if he had the building rented,

10   we could come up with some kind of plan to deal with the

11   arrears and get caught up to date.

12             THE COURT:  Uh-huh.  All right.

13             MR. DESSBERG:  It's certainly --

14             THE COURT:  This -- this is one more area where

15   you guys need to talk.

16             Ms. Perskie, it may be that this is the first time

17   you've met Mr. Dessberg.  If either of these cases is going

18   to succeed, you're going to have to be proactive in reaching

19   out to the other parties, talking to them and either trying

20   to make deals or fail.  But you -- you can't be passive on

21   this stuff.

22             So this is one additional thing for you to put on

23   the agenda of matters to discuss in the conference room.

24             MS. PERSKIE:  Thank you, Your Honor.

25             THE COURT:  Mr. Cometti, are there domestic

1   support obligations that aren't being satisfied in this

2   case?

3           MR. COMETTI:  Yes, Your Honor.

4           THE COURT:  How much are they?  What's the nature

5   of the --

6           MR. COMETTI:  Tens of thousands.

7           THE COURT:  Am I -- obligations of this character

8   have both priority and non-dischargeability implications.

9   What's your game plan for dealing with those, Ms. Perskie?

10          MS. PERSKIE:  Obviously, those would need to be

11  dealt with first.  We have concerns about the amount of

12  alimony.  It's -- it's $8,000 --

13          THE COURT:  Concerns of what nature?  Are --

14          MS. PERSKIE:  -- a month.

15          THE COURT:  -- they fixed by a court order?

16          MS. PERSKIE:  It was done per separation

17  agreement.

18          MR. COMETTI:  Which was incorporated into a

19  divorce decree, Your Honor.

20          THE COURT:  Yeah.  I'm not an expert on domestic

21  relations law, but I was under the impression that that's

22  often the case.

23          MS. PERSKIE:  And --

24          THE COURT:  So -- so the separation obligation was

25  converted into an obligation under the divorce decree, Mr.

1    Cometti?

2             MR. COMETTI:  That's correct, Your Honor.  And

3    there's no pending modification.  There's no pend -- there's

4    -- the --

5             THE COURT:  Pull the mic closer to you, please.

6             MR. COMETTI:  I'm sorry.  The divorce was in the

7    State of Connecticut.  Right now there has been a multitude

8    of post-judgment filings in connection with the obligations

9    of support and alimony.  As far as I'm aware, there's no

10   pending motion for modification.

11            So to the extent that there has been an expression

12   that the alimony is too high, all I can say is too bad.

13   There's an order that says -- that sets it forth.  They have

14   not made an application to reduce it.  I'm not sure why they

15   would raise that as a topic here because this isn't the

16   proper venue for that -- those type of considerations.

17            THE COURT:  Earlier in your remarks you mentioned

18   some kinds of motions that were going on.  What were you

19   making --

20            MR. COMETTI:  Enforcement, contempt.

21            THE COURT:  Oh, in other words, you're on offense

22   and you're asking that the order as it now exists be

23   enforced?

24            MR. COMETTI:  Correct.  There's been continuing

25   for several years non-compliance.

1           THE COURT:  Okay.  Does anybody have any further

2    thoughts they want to share with me before I ask that you

3    continue in the conference room?

4           MR. DESSBERG:  No, Your Honor.

5           MS. PERSKIE:  No, Your Honor.

6           THE COURT:   All right.  I don't know how many of

7    these issues, especially on the debtor -- individual debtor

8    side can be resolved without judicial intervention, but it's

9    obvious to me that there hasn't been enough talking in this

10   case.

11          See if you can make progress in my conference

12   room, and then I'm going to need to have a follow up

13   conference fairly soon.  Get a date agreeable to all of you

14   from Ms. Blum (ph), and I want it in a three-week range.

15   Normally, I trail at least by 30 or 45 days.  This case

16   needs more talk, not less.  Get a date from Ms. Blum in the

17   three-week range.

18          And I want everybody in the conference room and

19   see what you can resolve.

20          MS. PERSKIE:  Thank you, Your Honor.

21          THE COURT:  Okay.  Thank you.

22       (Whereupon these proceedings were concluded at 11:08

23   a.m.)

24

25

1                              I N D E X

2

3                              RULINGS

4    DESCRIPTION                              PAGE        LINE

5    N/A

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 47

1                      C E R T I F I C A T I O N

2

3      I, Sherri L. Breach, CERT*D-397, certified that the

4      foregoing transcript is a true and accurate record of the

5      proceedings.

6

7      Sherri L Breach      Digitally signed by Sherri L Breach
                            DN: cn=Sherri L Breach, o, ou,
                            email=digital1@veritext.com,
8                           c=US
                            Date: 2013.10.14 12:37:06 -04'00'

9      SHERRI L. BREACH

10     AAERT Certified Electronic Reporter & Transcriber

11     CERT*D-397

12

13     Veritext

14     200 Old Country Road

15     Suite 580

16     Mineola, New York 11501

17

18     DATE:  October 12, 2013

19

20

21

22

23

24

25